51 F.3d 280
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
In re JOINT BRIEFING OF ISSUES ON APPEAL FROM The
TRANS-ALASKA PIPELINE LIABILITY FUND.
Herman O'FRANCIA, Claimant,
and
ALASKA SPORT FISHING ASSOCIATION; Rod Arno; Sara J. Arno;
Thomas Elias; Joe Klouda; Tom Lakosh; Anthony B. Lee;
John Pipkin; William Simmons; Michael Stanley; Milton
Stephens; Allen Tigert; Jeff Yates; Zenas "Ed" Zeine,
Claimants-Appellants,
v.
TRANS-ALASKA PIPELINE LIABILITY FUND, Defendant-Appellee.
In re JOINT BRIEFING OF ISSUES ON APPEAL FROM The
TRANS-ALASKA PIPELINE LIABILITY FUND.
Herman O'FRANCIA, Claimant,
and
Andrew ALLEN; Gordon A. Allen; Lawrence Allen; Ken
Barnes; Myra Allen, et al., Claimants-Appellants,
v.
TRANS-ALASKA PIPELINE LIABILITY FUND, Defendant-Appellee.
In re JOINT BRIEFING OF ISSUES ON APPEAL FROM The
TRANS-ALASKA PIPELINE LIABILITY FUND.
Herman O'FRANCIA, Claimant,
and
William W. LOY; Myra P. Mumchuck; Tim Gordon Swovoda;
Wayne E. Quinn; John F. Burch, et al., Claimants-Appellants,
v.
TRANS-ALASKA PIPELINE LIABILITY FUND, Defendant-Appellee.
In re JOINT BRIEFING OF ISSUES ON APPEAL FROM The
TRANS-ALASKA PIPELINE LIABILITY FUND.
Herman O'FRANCIA, Claimant,
and
Laurie REDINGTON; Gabbert's Fish Camp; Copper River
Fisherman's Cooperative, Claimants-Appellants,
v.
TRANS-ALASKA PIPELINE LIABILITY FUND, Defendant-Appellee.
In re Exxon VALDEZ.
ALASKA SPORT FISHING ASSOCIATION; Allen Tigert; Joe
Klouda; William Simmons; Zenas "Ed" Zeine,
Plaintiffs-Appellants,
v.
TRANS-ALASKA PIPELINE LIABILITY FUND, Defendant-Appellee.
 Nos. 94-35219, 94-35226, 94-35224, 94-35244, 94-35225.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 7, 1995.
Decided March 24, 1995.
 
 Appeals from the United States District Court, for the District of Alaska, D.C. No. CV-92-01000-RHH, D.C. No. CV-89-00095-RHH; H. Russel Holland, Chief Judge, Presiding.
 D. Alaska
 AFFIRMED.
 Before: PREGERSON, KOZINSKI, and LEAVY, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 On March 24, 1989, the oil tanker EXXON VALDEZ ran aground in Prince William Sound, Alaska, causing a massive oil spill and resulting in the filing of hundreds of actions in state and federal courts. Many of the actions brought in federal district court were later consolidated and captioned In re the EXXON VALDEZ, while most of the actions initially filed in state court were removed to federal district court. See Eyak Native Village v. Exxon Corp., 25 F.3d 773 (9th Cir.), cert. denied, 115 S.Ct. 351 (1994). In addition, the United States and the State of Alaska filed parens patriae claims as trustees on behalf of the public, seeking damages for injury to natural resources.
 
 
 3
 Confronted with this veritable avalanche of law suits, the Chief Judge of the United States District Court for the District of Alaska solicited the views of the parties and, following briefing and a hearing, elected to use the administrative process provided by the Trans-Alaska Pipeline Authorization Act ("TAPAA")[1] for claims asserted against the Trans-Alaska Pipeline Liability Fund ("Fund").[2] Under this scheme, the Fund would examine all claims and either approve or disapprove them, in whole or in part, whereupon the district court would review de novo all challenges made to the Fund's determinations. The district court's rulings would then be subject to appellate review before this court.
 
 
 4
 The Fund's Board of Trustees delegated all of its authority with respect to claims arising out of the EXXON VALDEZ oil spill to the Honorable John J. Gibbons, retired (as of 1990) Chief Judge of the United States Court of Appeals for the Third Circuit. Under Judge Gibbons, the Fund enlarged its staff, hired experts, and republished notices throughout Alaska and the Pacific Northwest soliciting submission of TAPAA claims before the expiration of the two-year limitations period. Everyone whose claim was initially deemed to be legally compensable was sent a simplified request for information and documentation supporting the claim.
 
 
 5
 By early 1992, Judge Gibbons had preliminarily reviewed all of the more than 29,000 claims presented to the Fund. Within six months thereafter, Judge Gibbons had made his final decisions on all requests for reconsideration of those initial determinations. Some 3,300 of the claims that were filed with the Fund and examined by Judge Gibbons resulted in appeals to the district court. Four categories of those claims are now before us. Claimants include a sportsmen's association and individuals asserting personal and class claims for temporary loss of the recreational use of public natural resources [94-35219, 94-35244]; Native Alaskans asserting claims for loss of subsistence opportunities [94-35224]; and various individuals who either failed to appeal to the district court in a timely fashion [94-35225], or whose timely appeals were later deemed to have been abandoned [94-35226]. Each of these will be discussed in turn.
 
 
 6
 * The appeal in 94-35219 involves claims for damages filed on behalf of a putative class of some 130,000 sportsmen against the Fund to recover the value of their temporarily lost recreational use of public lands. The claimants sought to recover not individual awards of damages, but rather collective damages, i.e., the creation of a Conservation Trust and payment of money into that Trust. The Fund denied relief, holding that the claimants had failed to state a claim cognizable under TAPAA because they had not alleged an injury different in kind from that suffered by the public in general, and only the State of Alaska (or another government entity) could make such a claim on behalf of the public. On appeal, the district court upheld the Fund, albeit on the ground that the Consent Decree entered into between Exxon, the United States, and Alaska had disposed of the matter.[3]
 
 
 7
 These arguments are foreclosed by our decision in Alaska Sport Fishing Ass'n v. Exxon Corp., 34 F.3d 769, 772-74 (9th Cir.1994) (per curiam). Accordingly, we find no error in the district court's decision.
 
 II
 
 8
 Among the thousands of Native Alaskans who filed subsistence loss claims were 420 individuals who sought to recover damages for "non-economic" losses, i.e., cultural and psychic injuries to their way of life. The Fund denied their claims, based on its determinations that (1) TAPAA does not provide for the recovery of such damages, and (2) the claimants had failed to provide evidence of individual loss. Those denials were affirmed by the district court on the same grounds, and the 420 Native Alaskans have timely appealed.
 
 
 9
 The claimants in 94-35224 insist that they were entitled to recover damages, despite having failed to produce evidence of individual loss, because they provided the court with statistical evidence of collective loss, calculated on a per capita basis, in the form of an economic model showing disruption to a subsistence economy. The claimants argue that they were entitled to use the collective economic model rather than simply filling out individual claim forms, because the Fund imposed an unlawfully onerous burden on them by requiring each claimant to fill out a form listing individual losses.
 
 
 10
 The claimants cite no authority, and we have found none, that would support the contention that it was unlawful for the Fund to require anyone who wished to recover money from the Fund to fill out a form listing his or her claimed losses. Moreover, the argument that this requirement was onerous is belied by the fact that everyone else who sought money from the Fund, including thousands of other Native Alaskans, many of whom proceeded without benefit of counsel, submitted the forms. Accordingly, we reject this argument as meritless.[4]
 
 III
 A. Untimely Appeals
 
 11
 Docket Number 94-35225 involves fifteen individuals who, following adverse rulings by the Fund on their claims, filed appeals to the district court which were dismissed as untimely. Although the appellants admit that they were late in filing their appeals to the district court, they insist that the district court abused its discretion in dismissing their claims because the Fund had failed to mail proper notices of its adverse rulings to their counsel. The Fund argues that it properly notified each of the appellants and/or their counsel of record at the time.
 
 
 12
 While all fifteen appellants are represented by the same counsel here, some were either separately represented, or proceeded pro se, before the Fund. In a series of four separate orders, the district court made certain findings, none of which are disputed by the claimants on appeal, showing that the appellants received timely, actual notice of the Fund's denial of their claims; that the appellants knew, or reasonably should have known, of the deadline for filing notices of appeal; that, with respect to some claims, the attorneys who complained about untimely notices (i.e., notices having been mailed to their clients rather than to the attorneys themselves) did not in fact represent those clients with respect to those particular claims; that in at least one instance, the appellant did not oppose dismissal, because it had an identical claim that was being handled by a different law firm; and that some appellants opposed dismissals of claims against which the Fund had not even moved to dismiss.
 
 
 13
 Under the circumstances, we find no abuse of discretion in the district court's decisions dismissing these appeals.
 
 B. Abandoned Appeals
 
 14
 Docket Number 94-35226 involves thirteen individuals who, along with hundreds of others, initially presented their damage claims to Exxon rather than to the Fund. Exxon paid the claims and, as part of its settlement with the claimants, had them execute partial releases and assignments which gave to Exxon any right the claimants might have had against the Fund. When these claimants later presented the rest of their claims to the Fund, their claims were denied, in part because of the executed releases and assignments, and in part for lack of any evidence of damage.
 
 
 15
 Following these adverse rulings, the claimants filed timely appeals to the district court. The court ordered all parties whose claims had been dismissed "because of the signing of a release" to brief their appeals by May 17, 1993. These claimants did not do so. On July 9, 1993, the district court again ordered briefing on the claims, and warned the parties that failure to file their briefs would be construed as a voluntary dismissal of their appeals. July 9, 1993 came and went without any brief having been filed in the underlying appeal. By orders dated August 23, 1993, and January 25, 1994, the district court dismissed the thirteen appeals on the ground of their having been abandoned. The thirteen claimants now challenge that ruling on appeal, arguing that the district court's dismissal of their appeals constituted an abuse of discretion because they never intended to abandon their appeals.
 
 
 16
 In light of the above facts, we conclude that the district court did not abuse its discretion by dismissing the instant appeals on the ground of abandonment.
 
 IV
 
 17
 Each of the parties to the appeal in 94-35244 is also a party to the appeal in 94-35219, and they assert essentially the same loss of recreational use claims under TAPAA that they made in the earlier appeal. For the reasons already set forth in Alaska Sport Fishing Ass'n v. Exxon Corp., 34 F.3d at 773-74, and in light of our holding above, we conclude that this appeal is moot.
 
 V
 
 18
 Because we find no merit to any of the appellants' remaining arguments in any of the five appeals, the decisions appealed from are AFFIRMED. Each side will bear its own costs on appeal.
 
 
 
 *
 This disposition is not suitable for publication and may not be cited to or by the courts of this Circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Pub.L. No. 93-153, Title II, Secs. 202-207, 87 Stat. 584 (Nov. 16, 1973), as codified at 43 U.S.C. Secs. 1651-1656. Section 1656 was added as section 207 of Title II, Pub.L. No. 93-153, pursuant to Pub.L. No. 101-380, Title VIII, Sec. 8202, 104 Stat. 571 (Aug. 18, 1990)
 
 
 [2]
 See 43 U.S.C. Sec. 1653(c)(4); 43 C.F.R. Sec. 29
 
 
 [3]
 Under the terms of the Consent Decree, approved by the District Court in October 1991, Exxon agreed to pay the state and federal governments at least $900 million for natural resource and other damages. In exchange, the governments released Exxon and provided covenants not to sue "with respect to any and all civil claims," including those for natural resource damages. See Alaska Sport Fishing Ass'n v. Exxon Corp., 34 F.3d 769, 771 (9th Cir.1994) (per curiam)
 
 
 [4]
 The claimants also contend that their economic model, based on surveys of 98 tribal communities scattered over a wide area, was nevertheless appropriate for calculating certain types of non-market economic losses in the context of traditional subsistence economies. While perhaps suitable for a large and otherwise unwieldy class action involving many thousands of claimants scattered over a wide geographic range, the economic model was clearly inappropriate for this particular group of claimants